**UNITED STATES of America,**

**v.**

**Mohammed A. ALEEM, Defendant.**

**No. 8:13–cr–178 (GLS).**

United States District Court, N.D. New York.

Signed April 30, 2014.

Richard S. Hartunian, United States Attorney, Sean K. O'Dowd, Assistant U.S. Attorney, of counsel, Albany, NY, for the United States.

Cheryl Coleman Law Offices, Cheryl F. Coleman, Esq., of counsel, Albany, NY, for the Defendant.

---

**1.** *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**2.** *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**3.** *See* 18 U.S.C. § 3500.

## MEMORANDUM–DECISION AND ORDER

GARY L. SHARPE, Chief Judge.

### I. *Introduction*

Defendant Mohammed A. Aleem has been charged, in a one-count indictment, with alien smuggling in violation of 8 U.S.C. § 1324(a)(2)(B)(iii). (Dkt. No. 13.) By omnibus motion, Aleem seeks the following relief: (1) suppression of tangible and derivative evidence seized from his vehicle in contravention of his Fourth Amendment rights; (2) suppression of a statement obtained in violation of his Fifth Amendment *Miranda*[1] rights, and as a byproduct of the illegal vehicle search; (3) dismissal of the indictment because of irregularities during the grand jury presentation and because of unspecified defects in the indictment; (4) a discovery order; (5) an order requiring the disclosure of *Brady*[2] material; and (6) an order requiring early disclosure of Jencks Act[3] material. (Dkt. No. 25; Dkt. No. 30.) For the reasons that follow, the motion is denied in its entirety.

### II. *Facts*

The relevant facts are predicated on the court's evaluation of the following: the applicable burden of proof, *see United States v. Miller,* 382 F.Supp.2d 350, 361–62 (N.D.N.Y.2005); the suppression hearing testimony of United States Border Patrol agents and officers Kevin Dubuque, Jason Brault, Andrew Harder, and Matthew Robischon, Border Patrol civilian employee Jeremy Ashline, and Constable Claude Archambault of the Royal Canadian Mounted Police (RCMP) Integrated Border Enforcement Team, (SH:[4] 3–92); the sup-

**4.** Page references preceded by "SH" are to the consecutively paginated November 20, 2013 suppression hearing transcript. (Dkt. No. 29.)

pression hearing exhibits, (Exs. 1–7); Aleem's affidavit, (Dkt. No. 25, Attach. 2); and the parties' submissions, (Dkt. Nos. 25, 26, 30, 31, 32). *See* Fed.R.Crim.P. 12(d). The court credits the testimony of the government's witnesses, and discredits Aleem's affidavit, as noted.

The "Knuckle" is located close to separate Canadian and American ports-of-entry near Rouses Point, New York, and is an area commonly known for cross-border human smuggling by U.S. and Canadian law enforcement. (SH: 6–7, 10, 46.) The Knuckle includes an "L"-shaped road on the American side of the border and a Canadian road that terminates a short distance from the border. (SH: 6, 7–8, 39; Ex. 1.) U.S. authorities have installed sensors and infrared cameras in the area between the two roads. (SH: 4–5, 8.)

At 3:05 A.M. on March 5, 2013, Ashline, a Border Patrol dispatcher, detected a sensor activation at the Knuckle. (SH: 4–5.) He immediately notified Border Patrol field units, and began to scan the area with an infrared camera. (SH: 5.) Through the camera, he saw a subject—later identified as Mir Mustafa Ali, an illegal alien—running southbound from Canada into the United States, thus feloniously entering without inspection. (SH: 5, 28.) Simultaneously, Ashline saw a stationary vehicle on the Canadian side of the border and footprints in the snow leading from the car to Ali. (SH: 10–11.)

Approximately five minutes later, at 3:10 A.M., Ashline contacted an RCMP civilian dispatcher by telephone, and told him that there was a Knuckle sensor activation, a subject was running southbound into the U.S., a "drop-off" vehicle was stationary on the north side, and U.S. Border Patrol units were responding to the runner. (SH: 10, 15, 46.) A drop-off vehicle is a common

law enforcement designation for a vehicle transporting illegal aliens. (SH: 10.) Ashline communicated with his Canadian counterpart by telephone because there is no radio communication between American authorities and their Canadian counterparts. (SH: 19.)

After Ashline contacted the Canadian authorities, he panned the infrared camera and followed the progress of Border Patrol officers, who apprehend Ali within approximately ten minutes. (SH: 11–12, 28–29; Ex. 2.) Ashline then swung the camera back around to the drop-off vehicle and saw that it was still stationary, and that RCMP officials were at that location. (SH: 12.) During the ten-minute interval, Ashline heard U.S. radio transmissions and learned that Ali was of Indian descent and from the Toronto area. (SH: 13, 32.) At 3:25 A.M., Ashline again contacted his Canadian counterpart by telephone, and told him that Ali was in custody. (SH: 12–13, 21.)

Canadian law enforcement first detained Aleem, who was in the drop-off vehicle, at 3:25 A.M., and formally arrested him around 3:54 A.M. (SH: 43, 47.) His vehicle was searched afterward pursuant to § 99(1)(f) of the Canadian Customs Act, (SH: 45–47; Ex. 4); the search yielded two pieces of tangible evidence: a contract from an iPhone 4 and an empty iPhone 4 box, (SH: 48).[5] Although Aleem was charged with a Canadian crime, the charge was apparently dropped. (SH: 61.)

Later the same day, just before 3:00 P.M., Canadian officials presented Aleem to the Champlain port-of-entry where Border Patrol Enforcement Officer Brault *Mirandized* Aleem. (SH: 57–59; Ex. 5.) Aleem, who was unwilling to speak with officer Brault without a lawyer present,

---

**5.** As alleged in the criminal complaint, Ali was in possession of a telephone at the time of his arrest that matched the evidence found in Aleem's vehicle. (Dkt. No. 1 at 2.)

was not asked any questions consistent with his refusal, and was escorted to a secondary waiting area. (SH: 60–61.) Enforcement Officer Harder, who is primarily responsible for the prosecution of immigration-related offenses that occur at the port-of-entry, assumed Aleem's case from Brault at 4:00 P.M. on the shift change. (SH: 62–63.) The United States Attorney initially deferred prosecution of Aleem, which triggered removal proceedings. (SH: 63–64.) Officer Harder took Aleem's sworn statement in connection with the immigration removal proceedings. (SH: 65–67; Ex. 6.) In the statement recorded by Harder, Aleem declined to answer most of the questions related to his Canadian arrest earlier that day. (SH: 66; Ex. 6.)

On March 13, 2013, this prosecution was commenced by filing a criminal complaint charging Aleem with alien smuggling in violation of 8 U.S.C. § 1324(a)(2)(B)(iii). (Dkt. No. 1.) In connection with his initial appearance, Border Patrol Agent Robischon transported Aleem from the Clinton County Jail in Plattsburgh to the U.S. courthouse in Plattsburgh. (SH: 73–74.) While in a waiting area of the courthouse, Aleem made a statement to Agent Robischon (hereinafter "Statement 1"). (SH: 74.) In response, Robischon advised Aleem of his right to remain silent and that Aleem "may not want to talk to [him] without a lawyer present." (SH: 74–75, 77.) Robischon asked no questions of Aleem at any time; nevertheless, Aleem continued giving a statement (hereinafter "Statement 2"). (SH: 75, 77.) Aleem's statement was later reduced to writing by Robischon. (SH: 75; Ex. 7.)

Statement 1 consists of Aleem's explanation that, when he was apprehended, he was driving to Rouses Point, where he intended to spend the night, before continuing on to Malone, New York, to go snowmobiling the following morning. (Ex. 7.) Statement 2 includes, among other things, Aleem's assertion that, while trying to navigate to Rouses Point, he became lost and slid off the road while making a U-turn around 10:00 P.M.; he attempted to push his car free without success, and did not make a telephone call for help because he was without telephone service; he eventually "flagged .. down" an RCMP vehicle; he saw no one walk by his vehicle, but did see several people standing approximately one-quarter of a mile away; and, finally, that the physical evidence found in his vehicle was either planted by the authorities or obtained from another vehicle by them with their belief that it belonged to Aleem. (Ex. 7.)

In an affidavit supporting his suppression motion, Aleem states that his vehicle came to be stuck in the snow in the wee hours of March 5, 2013. (Dkt. No. 25, Attach. 2 ¶¶ 2–3.) He claims that U.S. and Canadian officials "searched [his] car for no reason, and without [his] permission." (*Id.* ¶ 3.) Aleem did not testify at the suppression hearing. The court discredits his affidavit.[6]

### III. *Discussion*

As explained above, *see supra* Part I, Aleem seeks various forms of relief in his omnibus motion. (Dkt. No. 25.) As an initial matter, other than those portions of Aleem's motion addressing suppression of tangible evidence and statements, he has failed to sufficiently articulate the basis for the relief he seeks. Indeed, his memorandum of law is silent as to all but suppression. (Dkt. No. 25 at 9–10.) Failing to

---

**6.** The court's prior observations regarding a defendant's failure to testify at a suppression hearing are apropos to its decision to discredit Aleem. *See Miller,* 382 F.Supp.2d at 362–63.

meet his burden, and largely for the reasons advanced by the government in its response, (Dkt. No. 26, Attach. 1 at 3–6, 10), Aleem's motion is denied with respect to dismissal of the indictment, discovery and inspection, *Brady* material, and Jencks Act material. Analysis of his arguments relative to suppression follows.

### A. Suppression of Tangible Evidence and Statements

While Aleem's motion generically cites violations of the Fourth, Fifth and Sixth Amendments and refers to "statements" and "tangible and derivative evidence," (Dkt. No. 25 at 2, 6–7, 9–10), the only issues he has specifically raised are as follows: (1) whether items seized during a search of his vehicle are inadmissible because the search was tainted by a preceding illegal arrest; and, (2) whether a non-*Mirandized* statement made shortly before his arraignment is inadmissible, (*id.* at 9–10). As it relates to the first issue, the court *sua sponte* questioned the availability of suppression as a remedy given the assertion that the initial arrest and search were effectuated by Canadian officials. (SH: 45, 90.) To the extent that Aleem has any other potential arguments, he has waived them by failing to raise them in his motion papers. *See Miller*, 382 F.Supp.2d at 364–65.

### 1. Tangible and Derivative Evidence

Aleem contends that the tangible evidence at issue was seized from his vehicle in violation of his Fourth Amendment rights. (Dkt. No. 25 at 9.) The primary basis of this misguided argument is that probable cause to arrest was lacking because "U.S. Border Patrol Agents never claim to have observed Ali get out of, or run from, [Aleem]'s car." (*Id.*) Aleem also asserts that he did not consent to a search of his vehicle, and the search is not a valid search incident to arrest because the arrest itself was constitutionally infirm. (*Id.* at 9–10.)

■ With the court's urging, the parties supplemented their briefing on the issue of the interplay between Canadian law and the Fourth Amendment protections of which Aleem seeks to avail himself. (SH: 45, 90; Dkt. Nos. 30, 31, 32.) On that issue, Aleem concedes that the Fourth Amendment generally does not apply to the conduct of foreign police officials, but argues that an exception applies in this case because the RCMP was acting as an agent of U.S. Border Patrol. (Dkt. No. 30 at 2–3.) Alternatively, Aleem asserts that, if Canadian law is deemed applicable to the search and seizure at issue, Canadian police officials were without the requisite "reasonable grounds" to justify a search under the Canadian Customs Act. (*Id.* at 3.) The government cogently argues that the exclusionary rule is inapplicable to the search of Aleem's vehicle because Canadian law enforcement was neither controlled nor directed by U.S. officials such that an exception to the general rule is invoked. (Dkt. No. 31 at 1–4; Dkt. No. 32.) As explained below, because no agency or virtual agency relationship existed between U.S. and Canadian law enforcement, Fourth Amendment protections do not apply to the search of Aleem's vehicle.

■ "It is ... well-established that the Fourth Amendment's exclusionary rule, which requires that evidence seized in violation of the Fourth Amendment must be suppressed, generally does not apply to evidence obtained by searches abroad conducted by foreign officials" even when the arrestee is an American citizen. *United States v. Lee*, 723 F.3d 134, 139 (2d Cir. 2013) (citing *United States v. Janis*, 428 U.S. 433, 455 n. 31, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976)). Two circumstances in which evidence obtained in a foreign

jurisdiction may be excluded have been recognized by the Second Circuit: (1) "where the conduct of foreign officials in acquiring the evidence is so extreme that [it] shock[s] the judicial conscience"; and (2) "where cooperation with foreign law enforcement officials may implicate constitutional restrictions." *United States v. Maturo*, 982 F.2d 57, 60–61 (2d Cir.1992) (internal quotation marks and citations omitted).

 As for cooperation between foreign and domestic law enforcement officials:

> constitutional requirements may attach in two situations: (1) where the conduct of foreign law enforcement officials rendered them agents, or virtual agents, of United States law enforcement officials; or (2) where the cooperation between the United States and foreign law enforcement agencies is designed to evade constitutional requirements applicable to American officials.

*Id.* at 61 (internal citations omitted); *accord Lee*, 723 F.3d at 140. "In order to render foreign law enforcement officials virtual agents of the United States, American officials must play some role in controlling or directing the conduct of the foreign parallel investigation." *United States v. Getto*, 729 F.3d 221, 230 (2d Cir. 2013) (citing *Lee*, 723 F.3d at 140). This is so because "where American law enforcement agents do not have authority to control or direct an investigation abroad, application of the exclusionary rule to the fruits of that investigation would serve no deterrence purpose." *Id.* at 231. U.S. authorities' mere initiation of an investigation by a foreign police force, or a request for assistance, is not sufficient to demonstrate control or direction such that an agency or virtual agency exists. *Id.* at 232 ("[The] defendant's argument that the [foreign police] would not have investigated

[him] but for [a request by U.S. officials], even if true, does not bear upon whether American law enforcement directed the subsequent investigation.").

Here, there is no allegation, nor do the facts support a finding, that Canadian officials engaged in conscience-shocking behavior. Similarly, Aleem has not alleged, and the court does not find, that the cooperation between Canadian and U.S. law enforcement was designed to evade constitutional protections. Setting those issues aside, the exclusionary rule applies here only if the conduct of the Canadian officials rendered them agents or virtual agents of the U.S. law enforcement.

Aleem's contention that Ashline "requested that Canadian authorities stop the car," (Dkt. No. 30 at 2), is unfounded. The hearing testimony and evidence, which the court fully credits, establishes that Ashline informed the RCMP that there was a sensor activation in the vicinity of the Knuckle, a suspect was heading southbound into the U.S., a drop-off vehicle was stationary on the North side of the border, and that agents were responding on the American side of the border. (SH: 10.) Ashline again contacted the RCMP to inform them that the southbound suspect had been apprehended. (SH: 12–13.) At best, Ashline's call to the RCMP demonstrates the kind of information-sharing that was specifically approved in *Getto. See* 729 F.3d at 231–32. American law enforcement agents were not involved with Aleem's subsequent arrest or the search of his vehicle. (SH: 43–49.) The only other interactions between Canadian and U.S. officials was constable Archambault's telephone call to Kyle Warner of U.S. Border Patrol to inform him of the evidence seized during the search, and Aleem's return to the U.S. port-of-entry by Canadian agents after the search was conducted. (SH: 48, 49, 58.) Collectively, these facts do not

demonstrate an agency relationship, and, accordingly, the exclusionary rule is inapplicable to the search of Aleem's car.[7] His motion to suppress tangible and derivative evidence is therefore denied.

### 2. Statements

In an argument that relies upon his earlier-addressed contention, Aleem claims that his statements were tainted by an unlawful arrest and must be suppressed. (Dkt. No. 25 at 10.) Moreover, he contends that the statements are the product of a custodial interrogation without the benefit of *Miranda* warnings, and were induced by interrogation techniques like those condemned in *Brewer v. Williams,* 430 U.S. 387, 392, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), the "Christian burial speech" case. (*Id.* at 10.) Aleem's arguments are unavailing and his motion to suppress statements is likewise denied.

■ Aleem's first contention, that suppression is warranted because his statements are tainted by an unconstitutional arrest, (Dkt. No. 25 at 10), is without merit. As explained above, suppression of statements under Fourth Amendment analysis, which stems from an arrest by foreign officials, here the RCMP, is not available to Aleem.[8]

■ Turning to his alternate argument, the court fully credits agent Robischon's testimony that, without any provocation, Aleem made statements while awaiting arraignment regarding the early morning

hours of March 5, 2013. (SH: 82–83.) Aleem does not dispute that he made Statement 1 without any inquiry from Robischon; in fact, his affidavit makes no reference to the statements he made. (Ex. 7.) Aleem continued speaking after Robischon reminded him of his *Miranda* rights even though Robischon asked no questions of him. (SH: 74–75, 77; Ex. 7.)

Statements 1 and 2 were both made spontaneously; that is, without any interrogation or confrontation whatsoever. *See United States v. Colon,* 835 F.2d 27, 30 (2d Cir.1987). Statement 2 was also made after agent Robischon reminded Aleem of his *Miranda* rights, (SH: 77), evincing Aleem's waiver of those rights by his continuation. Finally, Aleem's argument that interrogation techniques, like those employed in *Brewer,* 430 U.S. at 392–93, 97 S.Ct. 1232, were used to induce his statements, (Dkt. No. 25 at 10), is meritless. Here, Robischon said nothing to Aleem during transport from County Jail to the federal courthouse, said nothing while waiting with Aleem for arraignment until Aleem began to make Statement 1, at which point Robischon only reminded Aleem of his *Miranda* rights, and said nothing else while Aleem was making Statement 2. (SH: 74, 78.) Accordingly, Robischon did not use any techniques to elicit a statement from Aleem. In consideration of the foregoing, there is no basis to suppress Statements 1 and 2 and

---

**7.** Alternatively, if analyzed under federal law, the warrantless search of Aleem's vehicle was a valid search incident to arrest. Indeed the totality of the circumstances clearly demonstrate probable cause to believe that Aleem was involved in illegal smuggling activity. *See infra* note 8, at 116.

**8.** Even if the arrest at issue were effectuated by U.S. law enforcement and analyzed under Fourth Amendment principles and U.S. law,

the arrest was supported by probable cause. The facts—including the location of Aleem's car near the border in an area known for smuggling, time of day that the events unfolded, and footprints in the snow from the area of Aleem's vehicle to where Ali was first seen by Ashline, (SH: 4–5, 10–11)—demonstrate that probable cause existed to believe that Aleem was engaged in alien smuggling in violation of 8 U.S.C. § 1324(a)(2)(B)(iii).

Aleem's motion seeking the same is denied.

### IV. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Aleem's omnibus motion (Dkt. No. 25) is **DENIED;** and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**